738 A.2d 881

**Carolyn BOITNOTT et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE et al.**

**No. 18, Sept. Term, 1999.**

Court of Appeals of Maryland.

Oct. 8, 1999.

228

John C. Murphy, Baltimore, for Petitioners.

David W. Kinkopf (Stephen A. Goldberg, Gallagher, Evelius & Jones, L.L.P., on brief), Baltimore; Sandra R. Gutman, Associate Sol. (Otho M. Thompson, City Sol., Burton H. Levin,

Principal Counsel, on brief), Baltimore; Gerald R. Walsh, Baltimore, on brief, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL, and ROBERT L. KARWACKI, (Retired, Specially Assigned), JJ.

BELL, Chief Judge.

The issue presented for the Court's consideration is the validity of Baltimore City Ordinance 97–231, amending Inner Harbor East's urban renewal plan. We shall hold that the ordinance is valid.

## I.

On November 19, 1971, by Ordinance 71–1188, the City of Baltimore ("City"), through the Mayor and City Council, designated Inner Harbor East, a 20 acre tract south of Little Italy and lying between Fells Point and the Inner Harbor, as an urban renewal area, for which it approved an urban renewal plan.[1]

Among the objectives of the plan were the elimination of unhealthy conditions and uses incompatible with mixed land use, removal of substandard buildings, provision of land for public improvements and expansion, improvement of traffic movement by redesigning existing streets, stimulation of economic activity, development of an urban residential community, and ability to take advantage of the closeness to the Inner

---

1. Article 13, § 24(b) of the Baltimore City Code, which provides authorization for such plans, as relevant, reads:

"24. Renewal and conservation plans.
 * * * *

"(b) As used herein a Renewal Plan means a plan, as it exists from time to time for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof. When a plan is applicable to less than an entire Renewal Area, it shall include a description of the boundaries of the area to which it applies. The plan shall include a land use map showing the proposed use of all land within the area to which the plan is applicable, including the location, character, and extent of the proposed public and private ownership . . . ."

Harbor by such things as pedestrian connections. The major tasks to be undertaken in line with the objectives were rehabilitation and/or redevelopment, acquisition of substandard structures, and public improvements such as utilities, open space development, pedestrian and vehicular elements, and parking and street fixtures. Limits were also placed on the development: parking had to be enclosed in structures away from public view, servicing had to be offstreet, access had to be open to pedestrians, and to a certain extent, vehicles. In 1990, after several years of study, the urban renewal plan was amended by Ordinance 492. That amendment was the fifth such amendment.

As amended, the plan contemplated a mixed use neighborhood, predominantly residential and of moderate density. Its major design principles were summarized as follows: mixed-use development, with active edges along the water; extension of existing streets to the water's edge; smaller architecture at the water's edge with larger buildings placed further from the water; emphasis on public spaces; market-driven residential buildings with complementary aesthetics; and use of familiar Baltimore material and building types. The plan also provided that future development would include a combination of commercial, hotel, and office uses; creation of a park in the center of the tract, with buildings subject to height limitations, mandates for efficient traffic movement, and a restriction on the height of the buildings along the waterfront and in the center of the tract. The plan called for building heights along the waterfront of no more than 110, and a maximum of 350 hotel rooms.

On December 17, 1997, the City passed Ordinance 97–229, titled "Zoning—Business Planned Development Baltimore Inner Harbor East," a zoning ordinance that approved the application of Harbor East Limited Partnership (HELP) to build a hotel in the urban development area. The zoning ordinance provided for a minimum of 600 parking spaces and 750 hotel rooms and for certain accessories to the hotel, such as a meeting hall and banquet facilities, taverns, and restaurants. *See* Ordinance 97–229 § 3(a). It further established

that the "height of the building on the Property may not exceed 430 feet, the base of the building may not exceed 111 feet, and the floor area ratio requirement for the building shall be 7.0." *See* Ordinance 97–229, § 5. The ordinance also provided for the change of the location of the hotel on the five acre site.[2]

The following day, the Mayor of Baltimore approved Ordinance 97–231, thus amending the urban renewal plan for the seventh time. By that amendment, it was intended that the plan "incorporate by reference the provisions of the Baltimore Inner Harbor East Business Planned Development[3] as approved by the Mayor and City Council of Baltimore, as those provisions apply to certain portions of the Urban Renewal

---

2. How much the proposal adopted by Ordinance 97–229 diverged from the urban renewal plan is reflected in the report of the Urban Design Committee of the Baltimore Chapter of the American Institute of Architects, to whom the HELP PUD proposal was submitted for comment:

"We are concerned about the size and visual impact of the landmark hotel proposed for Inner Harbor East. The 450 hotel would become Baltimore's second largest building, even 110 taller than the Harborview complex which illustrated how highly visible isolated towers at the water's edge become. Most importantly the proposed hotel project violates the Inner Harbor East Urban renewal Plan of 1990 in several respects:

"1. The development areas will be reduced from eight to six. (A reduction from nine to eight occurred already when the Sylvan Learning Center Complex was built.) The resulting parcels are larger allowing bulkier building masses and fewer views of the water from inlaying areas.

"2. Two public streets built as public infrastructure will be closed as a result of the parcel enlargements. Most notably the streets along the promenade would be closed and be turned into private hotel outdoor space, eliminating a key element of the Urban Renewal Plan and the design concepts leading up to it.

"3. The proposed project exceeds the allowable building height in its area by almost 400%.(allowed: 120, proposed about 460).

"4. The proposed building is conceived as a landmark building. By contrast, the urban design studies for Inner Harbor East called for buildings which would form an ensemble resembling a traditional Baltimore neighborhood."

3. This reference is to Ordinance 97–229. See Council Bill 97–535, Ord. 97–229 Recitals page 2.

Area; to incorporate by reference provisions of any future Planned Developments within the Urban Renewal Area ..." Ord. 97–231, Recitals. In other words, the plan was amended to conform with the zoning classifications adopted in Ordinance 97–229.

Several taxpayers, Carolyn Boitnott, Nelson H. and Lily Adlin, and Aubrey Pearre, IV, the petitioners, filed, in the Circuit Court for Baltimore City, a Complaint For Declaratory Relief, Motion For Interlocutory Injunction against the Mayor and City Council of Baltimore, as one of the respondents, seeking to invalidate Ordinance 97–231. The other two respondents, HELP and Robert Marsili, moved to intervene as party defendants, which motions were granted. Having withstood a challenge by the respondents to their standing,[4] the petitioners filed an amended complaint, which, in addition to restating the grounds earlier advanced for invalidating the Ordinance, added counts and relied on changes to the proposed development made and announced after the adoption of Ordinance 97–231, as further bases for invalidation. The changes which the petitioners referenced and on which they now rely on appeal include: a change in the ownership of the land on which the hotel and garage are to be built from private ownership, as in the urban renewal plan, to public ownership,[5] reduction of the height of the building by 80 feet,

---

4. A companion case, brought by The Waterfront Coalition, Inc., Scarlett Place Residential Condominium Association, Inc., certain individuals, including Nelson H. and Lily Adlin, two of the petitioners herein, sought judicial review "of the legality of the proceedings in enacting Ordinance 97–229 of the Mayor & City Council of Baltimore." The trial court granted summary judgment in favor of the defendants, respondents herein, on the basis that the plaintiffs lacked standing. That judgment was affirmed by the Court of Special Appeals and this Court denied certiorari. By contrast and noting that a different standard applies to taxpayers' actions—they need not be a party to the proceedings before the City Council and are "required merely to allege a potential pecuniary damage, i.e., increased taxes," a lesser burden, the court, correctly, we think, denied the motions to dismiss the declaratory judgment action.

5. This Court recently filed its opinion in *Mayor and City Council of Baltimore v. Boitnott,* —— Md. ——, ——, —— A.2d ——, ——, 1999 WL

change in the layout and configuration of the hotel to remove the garage from the hotel structure and the retention of the present routing of President Street.[6]

■ Following the filing of motions to dismiss, or in the alternative, for summary judgment by the respondents, the circuit court declared that Ordinance 97–231 is valid, finding "no merit in Plaintiff's arguments attacking the validity of Ordinance 97–231." [7]

---

740427, a case argued on the same day as the case sub judice. We held, contrary to the contention of the respondents therein, the petitioners in this case, that record title is sufficient ownership to authorize the grant of a payment in lieu of taxes pursuant to Maryland Code (1985, 1994 Repl.Vol., 1998 Cum.Supp.) § 7–501 of the Tax Property Article.

6. In the trial court, as reported by that court, the petitioners relied on the following changes:

 " 'removal of the garage from the hotel structure, and its replacement by a separate garage structure constructed approximately one block east of the proposed hotel; the elimination of a plan for the hotel to occupy portions of President Street and Aliceanna Street; a reduction in the height of the tower of the hotel from 430 to 350 feet, a change in the configuration of the hotel to an "L" shaped structure; and a change in the ownership of the land upon which the hotel is to be constructed from Inner Harbor East, LLC to the City of Baltimore.' "

7. The petitioners argued in the Court of Special Appeals and in the certiorari petition filed in this Court, that the circuit court dismissed their case because they failed to demonstrate standing and that ruling was in error. The intermediate appellate court was correct when it concluded, "Clearly, the case was not dismissed for lack of standing." To be sure, in its Memorandum Opinion, the trial court stated:

 "That case [*Citizens Planning and Housing Association v. County Executive, Baltimore County,* 273 Md. 333, 329 A.2d 681 (1974)] and the others cited 'require' that a taxpayer plaintiff show that the governmental action complained of will result in an increase in taxes. Here, the Plaintiffs have not argued that the passage of Ordinance 97–231 will cause a pecuniary loss or an increase in taxes. There is not even a showing of potential pecuniary loss. *Inlet Associates v. Assateague House,* 313 Md. 413, 545 A.2d 1296 (1988). The Plaintiffs have merely shown that some of the improvements to the subject property will be deleted or altered. Plaintiffs have made no showing that these changes to the Plan will cause pecuniary damage or will result in an increase in their taxes or will affect them in some special way distinct from that of the general public.

 "Since the Defendant, Mayor and City Council's actions were in compliance with the existing statutes and, further, since Plaintiffs

 In any event, "Maryland has 'gone rather far in sustaining the standing of taxpayers to challenge ... alleged illegal and ultra vires actions of public officials.'" *Inlet Associates v. Assateague House Condominium Ass'n*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988), quoting *Thomas v. Howard County*, 261 Md. 422, 432, 276 A.2d 49, 54 (1971). The taxpayer plaintiff need not allege facts which necessarily lead to the conclusion that taxes will be increased; rather, the question is whether the taxpayer "reasonably may sustain a pecuniary loss or a tax increase ... whether there has been a showing of potential pecuniary damage." *Citizens Planning and Housing*, 273 Md. 333, 344, 329 A.2d 681, 687 (1974). (citations omitted). *See also Castle Farms Dairy Stores, Inc. v. Lexington Market Authority*, 193 Md. 472, 67 A.2d 490 (1949). The allegation by the petitioners that the City has expended Twenty million dollars in developing Inner Harbor East prior to the present litigation is sufficient allegation of potential pecuniary damage by way of tax increase to withstand a standing challenge. The petitioners appealed the judgment to the Court of Special Appeals, which, in an unreported opinion, affirmed the circuit court. They then filed a Petition for Writ of Certiorari with this Court, which we granted. We shall affirm the judgment of the intermediate appellate court.

## II.

The petitioners offer three arguments in support of their contention that Ordinance 97–231 is invalid: property may not be changed from private to public ownership after the adop-

---

have made no showing of any special damage, the taxpayers' suit will be dismissed."

Nevertheless, and despite its professed intention, the judgment in the case most certainly did not dismiss the case on standing or any other grounds. Rather, it declared the Ordinance, challenged as invalid, valid. It is well settled that "the opinion is no part of the judgment," *Fast Bearing Co. v. Precision Development Co.*, 185 Md. 288, 293, 44 A.2d 735, 737 (1945); *see Offutt v. Montgomery County Bd. of Ed.*, 285 Md. 557, 571 n. 4, 404 A.2d 281, 289 n. 4 (1979), and, so, no appeal could be taken from that statement in the opinion.

tion of the urban renewal plan; a zoning ordinance may not be incorporated into the urban renewal plan by reference; and the title of the ordinance is defective.

As to the first argument, the petitioners maintain that any changes made to an urban renewal development project after an urban renewal plan has been adopted must be made pursuant to a formal process, including a hearing. Further, they assert, citing Baltimore City Code Article 13, § 24(b),[8] the urban renewal plan must "delineate the extent of public and private ownership." That designation is necessary, they continue, because, once the plan is adopted, Article 13, § 24(b) authorizes the Department of Housing and Community Development ("HCD"), pursuant to Code, Article 13, § 25(e) to acquire the designated property.[9] The petitioners point as

---

8. That section provides:

> "The Plan shall include a land use map showing the proposed use of all land within the area to which the Plan is applicable, including the location, character and extent of the proposed public and private ownership. The Plan shall be sufficiently complete to define such land or property acquisition, acquisition of interests therein, demolition and removal of structures, disposition of land or property or interests therein, improvements and programs of renovation or rehabilitation and conservation, and activities to effect substantial environmental change, as may be proposed to be undertaken or carried out in the area to which the Plan is applicable; and the Plan shall include a statement of the methods and standards under which the same is to be accomplished and the necessary controls to be applied in order to effect rehabilitation and conservation by owners of existing properties."

9. That section reads:

> "(e) The approval by ordinance of a Renewal Plan or a Conservation Plan when required by subsection (b) of this Section shall constitute authorization to the Department of Housing and Community Development to acquire, by condemnation if necessary, all land and improvements thereon or interests therein designated for acquisition in said Renewal Plan or Conservation Plan and, subject to the approval of the Board of Estimates as hereinafter provided, to dispose of all land and improvements thereon or interests therein designated for disposition in said Renewal Plan or Conservation Plan. The standards and controls embodied in a Renewal Plan or Conservation Plan approved by ordinance shall thereupon become enforceable in the same manner as the other ordinances of the City."

well to Article 13, § 25(g),[10] which provides:

"No substantial change or changes shall be made in any Renewal Plan or Conservation Plan, which has been approved by ordinance, without such change first being adopted and approved in the same manner as set forth in this Section for the approval of the Renewal Plan or Conservation Plan originally."

Because there was no hearing as Article 13, § 25(d) requires for the adoption of a plan, petitioners concluded that, "it is unlawful to make the change from private to public ownership, and to make the other changes ... without a plan amendment making these changes." Petitioners note that Article 13, § 24(a) requires urban renewal projects undertaken by HCD to conform to the applicable urban renewal plan. And, citing Article 13, §§ 21–30, they argue "that it is the Department of Housing and Community Development and only the Department of Housing and Community Development which can undertake renewal projects."

Next, pointing to Article 13, § 24(a) and arguing that the plan is the foundation upon which zoning is built, the petitioner argues that, rather than considering the detailed standards that a plan contemplates, Ordinance 97–231 substituted the provisions of the zoning ordinance, and any future PUD, by reference, for the plan. Stating that "a plan is one thing, zoning is something else. You can't substitute a zoning ordinance for the required plan because the two are not synonymous," *see Board of County Comm'rs v. Gaster*, 285 Md. 233, 246, 401 A.2d 666 (1979), they maintain that "[t]here is an inherent arbitrariness if PUD's are incorporated by reference into the plan." Moreover, they aver that this approach undermines the reasoned basis for the plan.

---

**10.** Article 13, § 25(g) reads:

"(g) No substantial change or changes shall be made in any Renewal Plan or Conservation Plan which has been approved by ordinance, without such change or changes first being adopted and approved in the same manner as set forth in this Section for the approval of the Renewal Plan or Conservation Plan originally."

The petitioners also take issue with incorporation by reference because, they assert, it violates the Constitutional due process right to the hearing required by Article 13, § 25(d),[11] arguing that "the required hearing on the amendment of a plan does not occur when the amendment is automatically adopted by reference." Simply put, the petitioners state:

"You can't have a bona fide hearing on a bill to incorporate another pending bill by reference because the citizen attending the hearing cannot have the slightest idea how that bill will be amended; and you can't have a hearing to incorporate a PUD as it may be amended because the citizen attending the hearing cannot have the slightest idea of how the bill might be amended by some future city council."

Finally, the petitioners argue that the ordinance has a defective title, in violation of Article III, § 14 of the Baltimore City Charter,[12] because it is misleading. Their argument that the title is misleading in a material way is premised on the fact that it stated "its purpose was to incorporate by reference the PUD as approved by the Mayor and City Council," but

---

**11.** That section reads in part:

"25. Adoption and approval of plan.
* * *

"(d) The Department of Housing and Community Development may make recommendation to the City Council for the passage of an ordinance or ordinances approving any renewal plan or a conservation plan when required by subsection (b) of this section, which the Department of Housing and Community Development has adopted. No such ordinance shall be passed until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. ... Amendments to a renewal plan or conservation plan proposed as a result of a public hearing shall not require further notice or additional hearings, but all such amendment shall be referred to the Department of Housing and Community Development ... ."

**12.** The section that the petitioners refer to is Art. III. § 14(b), which reads:

"Ordinances, enactment of.
* * *

"(b) Every ordinance enacted by the City shall embrace but one subject, which shall be described in its title, and no ordinance shall be revived, amended or enacted by mere reference to its title, but the same shall be set forth at length as in the original ordinance."

rather than incorporating all of the restrictive provisions of the PUD, it intentionally left out the 25–year gambling prohibition.

Not surprisingly, the respondents see things differently. Characterizing each of the petitioners' arguments as meritless, they urge this Court to affirm the judgment of the circuit court and the Court of Special Appeals.

### III.

This case centers around the adoption of ordinances in Baltimore City and the extent to which the required procedures surrounding the adoption of one of them were followed. Article III, § 14 of the Baltimore City Charter addresses the enactment of ordinances. It provides, in its entirety:

(a) Every legislative act of the City shall be by ordinance or resolution. No ordinance or resolution shall be passed by the City Council except by a majority vote of its members, and on its final passage the vote shall be taken by yeas and nays, and the names of members voting for or against the same shall be entered on the Journal.

(b) Every ordinance enacted by the City shall embrace but one subject, which shall be described in its title, and no ordinance shall be revived, amended or enacted by mere reference to its title, but the same shall be set forth at length as in the original ordinance.

(c) No ordinance shall become effective until it be read on three different days of the session, unless the City Council by a vote of three-fourths of its members shall otherwise determine by yeas and nays to be recorded on the Journal, and no ordinance shall be read a third time until it shall have been actually printed or engrossed for a third reading.

(d) The City Council, by resolution, may authorize any standing or special committee to administer oaths and to summon witnesses as to any matters relevant to its investigation of any municipal agency.

Maryland Code (1957, 199–), Art. 66B, § 2.01(a)[13] provides the general authority for the Mayor and City Council of Baltimore

---

**13.** (a) For the purpose of promoting the health, security, general welfare, and morals of the community, the Mayor and City Council of

to adopt zoning regulations as necessary, "for the purpose of promoting the health, security, general welfare, and morals of the community." Section 2.01(b) [14] acknowledges and, to some extent, specifically delimits the scope of that authority. The Baltimore City Code contains specific provisions as to the planning process, including the definition and requirements of an urban renewal plan. See §§ 24 and 25 of Article 13.

The petitioners' first argument focuses on the changes to the project made subsequent to the amendment of the plan by enactment of Ordinance 97–231. As we have seen, those changes consist of an agreement pursuant to which title to the project property would be conveyed to the City and leased back to the developers, a reduction of the height of the hotel by 80, retention of the present routing of President Street, and the change in the layout and configuration of the hotel and garage structure. The petitioners' complaint is that these changes were made without the enactment of an ordinance and without a hearing being held.

The petitioners proceed on the premise that the changes to the project are of a nature to require, for validity, an amendment to the urban renewal plan. Their premise is faulty, however. Not every "proposal" that is the subject of a public hearing is substantial enough to require that it be the subject of an ordinance and thus of a second or subsequent public hearing. Certainly, changes to a project that do not conflict

---

Baltimore City are hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, off-street parking, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, signs, structures, and land for trade, industry, residence, or other purposes.

**14.** That section reads in pertinent part:
"(b) Statement of policy; construction of powers.—(1) It has been and shall continue to be the policy of this State that the orderly development and use of land and structures requires comprehensive regulation through implementation of planning and zoning controls. (2) It has been and shall continue to be the policy of this State that planning and zoning controls shall be implemented by local government."

with the urban renewal plan would not have to undergo that process. Such is the case with the changes *sub judice*. None of them necessarily conflicts with the urban renewal plan. As the respondents point out, the height restriction is a maximum, rather than an absolute admitting of no deviation. The configuration of the hotel and the garage similarly is a constraint on the developers, the change of which may not constitute a conflict with the plan. Nor does the plan require or mandate that the hotel and garage be privately owned.[15] As the respondents point out: "[T]he maps attached to Ordinance 97–231 indicate only the 'proposed public and private ownership' and by law serve as '*authorization*' for the Department of Housing and Community Development to acquire any property designated for acquisition using various means including by condemnation.... Petitioners erroneously treat this authorization for HCD to acquire property as a prohibition against the City acquiring property by other means at any other time. Nowhere does the Urban Renewal Plan prohibit the Mayor and City Council from acquiring land by other means (*e.g.*, purchase) if it is authorized to do so by other law."

Rejecting the petitioners' argument, the Court of Special Appeals observed:

> "The imposition of a rule requiring a new hearing each time substantive changes were proposed would bring meaningful legislation to a screeching halt. Only those changes to an ordinance so substantial as to change its basic character are regarded as sufficiently material to require that the public hearing process be repeated. *Ajamian v. Montgomery*

---

**15.** The respondents note that there is no evidence in this record, and the petitioners have not offered any, that the City has taken ownership of the property. Moreover, the evidence in *Mayor and City Council v. Boitnott, supra,* the companion case to which the petitioners refer for support on this point, hurts, rather than assists the petitioners; it demonstrates that the City's ownership will come later, after completion of construction, but not now. Therefore, we agree with the respondents, a justiciable controversy does not exist on this point. *Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 689–90, 526 A.2d 598, 601–602 (1987).

*County,* 99 Md.App. 665, 684, 639 A.2d 157, 166 (1994). The type of fundamental change requiring another hearing is set forth in *Meadowridge v. Howard County,* 109 Md.App. 410, 427–28, 675 A.2d 138, 146–47 (1996), where the change involved a second landfill in another location. Obviously, those living near the new site would have no reason to attend the initial hearing. The changes in the present case do not rise to the level requiring another hearing. After the change, the project is still a hotel with a parking garage on the same five-acre tract."

With this observation, we agree. It is also consistent with the provision in Ordinance 97–229, which contemplates that some changes to the development project be by ordinance:

"That after the City Council passes this Ordinance, any changes determined to be major or minor, including changes in density and use, shall require approval by Ordinance. Design approvals of architectural and site plan details, including building materials, fenestration, signage, awnings, porte-cocheres, outdoor areas, landscaping, and design details, shall require the approval of the Planning Commission."

Ordinance 97–229, § 6.

Moreover, the authority that the petitioners rely on does not support their argument. First, Article III, § 14 of the City Charter does not refer to a hearing as a prerequisite to the enactment of an ordinance. Because what is at issue is a plan amendment and not a zoning ordinance, Article 66B, the enabling act authorizing the Mayor and City Council to enact zoning ordinances, simply is not applicable to this case. The provisions of the City Code on which the petitioners rely say precisely what the petitioners say they do. The question, however, is whether their effect is what the petitioners say, given the circumstances here presented. To be sure, § 25(g) is clear enough. What is not as clear is whether, under these circumstances, the changes to the plan are substantial. We have concluded that they are not, noting as a matter of fact, that the changes did not clearly conflict with the plan. It is

also of some interest that § 25(h), relating to when a Council Member initiates a plan or an amendment, does not mention a hearing being required to be held, only that, prior to introduction, the matter is to be referred to HCD and the Department of Planning for assistance, and after introduction, to HCD and Planning for recommendation and report.

█ Next, the petitioners contend that Ordinance 97–231 violates the mandatory procedures outlined in both the Baltimore City Code and its Charter and, because of incorporation by reference, the petitioners' procedural due process right to a hearing, as well. The premise underlying the former is that the effect of Ordinance 97–231 is to substitute the provisions of Ordinance 97–229 for the plan. Because the premise is flawed, so too is the argument.

█ At the outset, it is clear and well settled that one legislative enactment does not, and indeed cannot, bind or preempt another legislative enactment. *See Haub v. Montgomery County,* 353 Md. 448, 461, 727 A.2d 369 (1999) and cases there cited. Furthermore, it also is clear and well settled that incorporation by reference is a perfectly acceptable and appropriate method of drafting legislation. *Smith v. Plymouth Locomotive Works, Inc.,* 304 Md. 633, 500 A.2d 1027 (1985). At issue in that case was whether, when it enacted a provision of the Commercial Law Article incorporating by reference "any act of Congress relating to bankruptcy," the General Assembly intended the federal law existing in 1975 or subsequent amendments to the federal bankruptcy code. *Id.* at 634, 500 A.2d at 1027. We concluded the latter. We explained:

> "The authorities uniformly agree that a statute may adopt all or part of another statute by descriptive reference thereto, and when this occurs it is as if the part adopted has been written into the adopting statute. It is also generally agreed that where the legislative intent is clear, the adopting statute will include subsequent modifications or amendments to the adopted statute."

*Id.* at 638–39, 500 A.2d at 1030. *See Hanrahan v. Alterman,* 41 Md.App. 71, 81–82, 396 A.2d 272, 278–79, *cert. denied,* 284 Md. 744 (1979) (footnotes omitted) for a clear statement of the rule:

"The law recognizes 'a special class of related statutes, ... the relationship [between which] results from the fact that one statute adopts the terms of the other without restating them.' Incorporating statutory provisions by reference, partially or entirely, into legislation has been long recognized as an acceptable practice on both the state and federal levels unless prohibited by constitutional provisions. 'The purpose of incorporating [adopting,] or referring to prior statutes is to avoid encumbering the statute books with useless repetition and unnecessary verbiage.' When passed, the incorporated act becomes a part of the incorporating legislation; it is as if the incorporated act was specifically written into the law.

"Reference statutes may be either Specific—reference by title or section number—or General—reference to the general law on the subject. Unless altered by statute, as in Maryland, the substantial differences between these two types of related statutes is that a general reference statute incorporates in its coverage all subsequent amendments and modifications to the incorporated act while specific reference statutes do not. It is settled that although general reference statutes are permissible, the language of incorporation must be specific enough to inform the citizenry of the applicability of the incorporated provisions."

The title to Ordinance 97–231 makes clear, as do the specific provisions of the ordinance, that no substitution for the plan was intended, rather only the incorporation by reference of those provisions of Ordinance 97–229 "as those provisions apply to certain portions of the Urban Renewal Area." More particularly, all the amendment did was allow uses permitted in a planned unit development and amend the restrictions and lot controls for Development Area 1, formerly Parcels P and Q1, to be those included in the planned development for those parcels. Ordinance 97–231 does not relieve the hotel or the

garage, or any other property in the area, of the need to comply with the other provisions of the plan, as amended. We agree with the respondents that:

"Petitioners ignore the simple reality that, like it or not, it is not illegal for the Mayor and City Council to amend an Urban Renewal Plan. This is what occurred in the 1990 amendments ... and this is what happened in Ordinance 97–231. Petitioners allege that the new amendments 'violate' the old Plan. Of course the amendments differ from the prior Plan, that is what amendments do. Significantly, Petitioners do not allege that the amendments contained in 97–231 violated any substantive requirements of State law or City Charter."

■ Procedural due process ensures that citizens are afforded both notice and an opportunity to be heard, where substantive rights are at issue. *See Reed v. Mayor and City Council of Baltimore,* 323 Md. 175, 183–84, 592 A.2d 173, 177 (1991); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 30, 410 A.2d 1052, 1058 (1980). We have held that the procedural due process right is not infringed, "by absence of notice, a hearing, or even any evidence when a legislative body adopts a legislative act." *Swarthmore Co. v. Kaestner,* 258 Md. 517, 532–33, 266 A.2d 341, 349 (1970) (quoting *Mayor & City Council of Baltimore v. Biermann,* 187 Md. 514, 50 A.2d 804 (1947)). Whether there are requirements of notice or a hearing is determined by reference to the applicable charter provision, *see id.* at 533, 266 A.2d at 349, or the applicable code.

The trial court found that, in this case, there was both notice and a hearing with respect to Ordinance 97–231, and referencing argument by the petitioners in a companion case, that the petitioners participated in the hearing. Conceding that no hearing or notice is required when legislation is enacted by the General Assembly, the petitioners view differently the City's legislative process. Continuing to press the point, they assert that a hearing is mandated by § 25(d) of the City Code. The petitioners do not deny that a hearing was held on Ordinance 97–231 and that they were present and

participated; rather, they maintain that the hearing was not meaningful—it occurred prior to the enactment of Ordinance 97–229, whose provisions it would incorporate by reference, and subsequent to the hearing, changes the petitioners characterize as major were made to the bill.

As we have seen, there are different procedures applicable to the processing of a bill to adopt or amend an urban renewal plan, depending upon who initiates it. Section 25(d) addresses the situation in which the Department of Housing and Community Development recommends adoption of a plan that it has adopted. In that situation, § 25(d) is explicit that a hearing must precede the enactment of an ordinance adopting or approving the plan. Section 25(g) requires the same approval procedure to be followed, i.e., a hearing, when substantial changes to the renewal plan have been made. On the other hand, § 25(h) applies to the situation in which a councilperson initiates the plan or an amendment to the plan. Although that section contains detailed provisions, unlike §§ 25(d) and (g), it does not have a hearing requirement.

■ In any event, the hearing in which the petitioners participated was adequate. The petitioners concede that the hearing involved incorporation by reference of the provisions of the zoning ordinance. That the ordinance had not passed when the hearing was held does not vitiate its value. Nor were the changes about which the petitioners complain of such a nature as to affect the validity of the hearing. The only amendments made to the ordinance were the addition of a new § 7 to state explicitly the restrictions placed on the PUD property, a matter already incorporated by reference by virtue of § 1, and the updating of the Plan maps.

■ Finally, the petitioners contend that Ordinance 97–231 is invalid because its title is misleading. Article III, § 14(b) requires an ordinance to be "described in its title." "The title of the ordinance satisfies the charter or constitutional requirement if it fairly advises the City Council and the public of the real nature and subject matter of the legislation sought to be enacted." *McBriety v. City of Baltimore*, 219

Md. 223, 241, 148 A.2d 408, 419 (1959). We pointed out in *Allied American Ins. Co. v. Comm'r,* 219 Md. 607, 615, 150 A.2d 421, 426 (1959), however, that "[a] title to an act need not be an index to all that it contains and need not set forth all of its exclusions or conditions. It is a label and need only set forth its object, not its product." Moreover, " 'For testing conformity of a title to this constitutional requirement [that the subject of a law be described in its title], there is enjoined upon the courts a disposition to uphold rather than to defeat the enactment.' " *Mayor and City Council of Baltimore v. Perrin,* 178 Md. 101, 112, 12 A.2d 261, 266 (1940), quoting *Board of Education v. Wheat,* 174 Md. 314, 318, 199 A. 628, 630 (1938).

Article III, § 29 of the Constitution of Maryland, similar to the City Charter provision, directs that "every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." *Ogrinz v. James,* 309 Md. 381, 398, 524 A.2d 77, 86 (1987). This Court interpreted that provision to require that the title to a bill inform members of the Legislature and the public about the bill's nature, rather than provide an abstract of its contents. Thus, although it involves the State constitutional provision, *Pressman v. State Tax Commission,* 204 Md. 78, 84, 102 A.2d 821, 825 (1954) is instructive. *See Master Royalties Corp. v. Baltimore,* 235 Md. 74, 90, 200 A.2d 652, 660 (1964) ("Because of the similarity of this [Charter] provision to Sec. 29 of Article III of the State Constitution relating to Acts of the General Assembly, cases dealing with one are pertinent to the other."). In *Pressman,* we held that "the constitutionality of a statute may be challenged in a declaratory judgment action on the ground that the title of the statute is not descriptive of the body . . . ." We went on to state, however, that the test for determining whether a title is faulty, is whether it "led to a misconception of the enactment." *Id.* at 92, 102 A.2d at 828. There is a misconception of enactment, we pointed out, when the inconsistency between the title and the body of the Act frustrates the objects of the constitutional provision:

"(1) to prevent hodgepodge or log-rolling legislation; (2) to prevent surprise or fraud upon members of the Legislature by giving notice of provisions in bills which might otherwise be overlooked and carelessly and unintentionally adopted; and (3) to apprise the citizens of the State of the subjects of legislation which are being considered, so that anyone may have an opportunity to be heard thereon, by petition or otherwise."

*Id.* at 92, 102 A.2d at 829.

■■■■ The title to Ordinance 97–231 states:

"Urban Renewal—Inner Harbor East—Amendment No. 7

For the purpose of amending the Urban Renewal Plan for Inner Harbor East to incorporate by reference the provisions of the Baltimore Inner Harbor East Business Planned Development as approved by the Mayor and the City Council of Baltimore as those provisions apply to certain portions of the Urban Renewal Area, and to incorporate by reference the provisions of any future Planned Developments within the Urban Renewal Area; deleting references to parcel Q6; revising certain exhibits attached to the Urban Renewal Plan to reflect the changes in the Plan; waiving certain content and procedural requirements; making the provisions of this Ordinance severable, and providing for the application of this Ordinance in conjunction with certain other ordinances."

The petitioners point out that while the title states that the provisions of the PUD ordinance, 97–229, are incorporated by reference, "the bill did not incorporate the PUD because it left out the gambling prohibition." [16]

---

**16.** Ordinance 97–229, § 3(a) sets forth permitted uses in the Planned Development, the same uses enumerated in § 7(a) of Ordinance 97–231. Ordinance 97–229, § 3 contains three other subsections restricting the Development, including subsection (d), which states: "The hotel will be operated as a multi-market hotel for 25 years. Additionally, the hotel will be operated without gaming operations for 25 years." This restriction is missing from Ordinance 97–231.

It is correct that § 7 of Ordinance 97–231 enumerates restrictions applicable to "the property for which the Harbor East Limited Partnership has applied for designation as a Business Planned Unit Development," but fails to list among them the gambling prohibition. Nevertheless, we do not agree with the petitioners. The title to Ordinance 97–231 is not so faulty that it is deceptive; as we see it, the title sufficiently put the public on notice of what the City Council intended, and thus enabled any interested persons to participate in the process. It is instructive that the petitioners were able to understand the significance of the proposed ordinance and attended the hearing held to consider it. Although the gambling provision was not repeated verbatim in Ordinance 97–231, the operative provisions of the ordinance make clear that the relevant provisions of Ordinance 97–229 were, in fact, incorporated by reference into the urban renewal plan: § 1(g) ("To the extent there exists any conflict between the provisions of . . . this Renewal Plan and the standards and controls of any PUD, or there are standards and controls contained in any PUD that are not contained in the Renewal Plan, the standards and controls of said PUD, including, without limitation, those affecting use, parking, access, aesthetic controls, setbacks, specific lot controls and building heights, shall be controlling."); § 8 ("AND BE IT FURTHER ORDAINED, that in the event of any conflict with the provisions of this Urban Renewal Plan, the provisions of the Inner Harbor East Business Planned Unit Development, as it may be amended shall be controlling."). Thus, the Court of Special Appeals correctly concluded: "The public was advised by the title that the Act intended to incorporate the PUD. As to the language dealing with the gaming, though it is not repeated it is incorporated by reference into the ordinance."

*JUDGMENT AFFIRMED, WITH COSTS.*